IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FORREST W. PHILLIPS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 09–cv–0997–SCW |
| HUNTER MARINE TRANSPORT, INC., et al., | ) ) ) ) |
| Defendant. | ) ) |

# FINDINGS OF FACT & CONCLUSIONS OF LAW

**WILLIAMS, Magistrate Judge:**

This action began as an admiralty case against barge owner Hunter Marine, and transformed into a fraud case against Hunter Marine's former employee Forrest Phillips. A jury returned a verdict against Phillips on November 11, 2011. The matter now comes before the Court for a bench trial on the portions of Mr. Phillips' complaint that were not presented to the jury. For the reasons explained below, the Court finds that Phillips was not injured during his work at Hunter Marine,[1] and **ORDERS** that the Clerk enter **FINAL JUDGMENT** in the case for Hunter Marine and against Forrest W. Phillips.

PROCEDURAL BACKGROUND

In November 2009, Forrest Phillips sued Hunter Marine under the Court's admiralty jurisdiction and Federal Rule of Civil Procedure 9(h). Phillips asserted claims for (1) negligence under the Jones Act, 46 U.S.C. § 30104;[2] (2) unseaworthiness under general maritime law, and (3) maintenance and cure under general maritime law. In each Count, Phillips alleged that, while

---

[1] Hunter Marine Administrative Services, LLC, is also a party in the case, but for purposes of this order, shall be referred to collectively with Hunter Marine Transport, Inc. as "Hunter Marine."
[2] The Jones Act was previously codified at 46 U.S.C. § 688.

1

employed by Hunter Marine and working on the *L.R. Chapman*, he was injured on April 13, 2009, by a defective wire that jerked and injured his right shoulder and arm. Phillips did not demand a jury trial.

Hunter Marine, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332, asserted counterclaims for material misrepresentation and fraud. Hunter Marine alleged that Phillips injured himself before boarding the *L.R. Chapman*, and that he falsely reported that he was physically able to perform his duties when he boarded the vessel on March 14, 2009, then falsely claimed that he was injured aboard the *L.R. Chapman*. Hunter Marine demanded a jury trial on its claims.

In January 2011, the parties fully consented to the undersigned magistrate judge's authority, and the case was fully referred pursuant to 28 U.S.C. 636(c), Federal Rule of Civil Procedure 73, and SDIL-LR 72.2(b)(3). After Hunter Marine's counterclaims were bifurcated and set for a jury trial in November 2011, to be followed (if necessary) by a bench trial on Phillips' Jones Act and general maritime claims. The parties stipulated that Hunter Marine had paid Phillips $92,110.88 as a result of Phillips' alleged workplace injury. The jury trial was held from November 8–10, 2011. The jury answered the following special interrogatories in the affirmative:

1. Did Forrest Wade Phillips conceal or misrepresent information from Hunter Marine's management when he completed the boarding report on March 14, 2009?

2. Did Forrest Wade Phillips conceal or misrepresent information from Hunter Marine's management when he reported being injured on the job on April 14, 2009?

3. Was the information that Mr. Phillips concealed or misrepresented material to Hunter Marine's decision to permit Mr. Phillips to work aboard the *L.R. Chapman* and/or to pay employment-related benefits to him as a result of an injury he claimed to have sustained on the *L.R. Chapman*?

4. Did Mr. Phillips' concealment and/or misrepresentation of material information cause Hunter Marine to pay benefits which it would not otherwise have paid?

5. Did Forrest Wade Phillips knowingly conceal or misrepresent material information to Hunter Marine when he boarded the *L.R. Chapman* on March 14, 2009 and completed the boarding report?

6. Did Forrest Wade Phillips knowingly conceal or misrepresent material information to Hunter Marine when he reported being injured on the job on April 14, 2009?

7. Did Forrest Wade Phillips conceal and/or misrepresent the information with the intent to deceive Hunter Marine and induce Hunter Marine to pay money to Phillips or to others on Phillips' behalf?

8. Did Hunter Marine pay money to Phillips and to others on Phillips' behalf in justifiable reliance on the facts as Hunter Marine knew them?

9. Did Hunter Marine's damages result from the concealment or withholding of material facts by Forrest Wade Phillips?

10. Do you find that Forrest Wade Phillips should be liable to Hunter Marine for punitive damages for his conduct?

The jury assessed punitive damages against Phillips for $5,000.

On December 19, 2011, the Court held a bench trial on Phillips' claims. The bench trial included (with all parties' agreement) consideration of all the testimony, exhibits, and other evidence that was offered during the jury trial.

## FINDINGS OF FACT

Hunter Marine hired Phillips in May, 2008 to work as a deckhand aboard its river towboats. Phillips was an experienced deckhand who previously worked for several other river companies. At Hunter Marine, Phillips generally worked for 28 days aboard a vessel and then had 14 days off at home. At the beginning of each trip, Hunter Marine required Phillips (like all its crewmember employees) to complete a boarding report, which included a question as to whether he was aware of any physical or mental condition that "may impair [his] ability in any manner from performing all required job duties while aboard this vessel." (Ex. HM 18). On March 14, 2009, Phillips reported for work to begin a trip aboard the M/V *L.R. Chapman* and answered "no" to that question. (*Id.*).

Evidence was presented that sometime after he boarded the *L.R. Chapman*, Phillips complained to at least two other crewmembers—leadman Ronnie Willett and deckhand Anthony

Ruley—about pain in his right arm and shoulder. Willett testified that Phillips asked whether Willett would assist him in making a fraudulent injury claim by agreeing to say that he saw Phillips hurt his arm on the job if Phillips "went out and started acting like it was hurt." Although Phillips denied saying these things to Willett, Willett's testimony was unequivocal:

> Q. Okay. As you sit here today under oath, are you absolutely sure that he asked you to work with him on verifying this story on him getting hurt when he really didn't?
>
> A. I'm absolutely sure.

(Court's Ex. 5 at 31; *see also id.* at 32–33). Moreover, both Willett and Phillips testified that they were friends who got along well. (*Id.* at 32). Other than his own denial, Phillips failed to offer any evidence to suggest Willett's testimony was untruthful.

Willett's testimony is also bolstered by the testimony of Anthony Ruley. Ruley testified that Phillips told him that Phillips had hurt his arm and shoulder while working on his car at home, and that he was going to get the company to pay for it before the trip was over. Ruley testified this conversation occurred shortly after Ruley boarded the boat on April 2, 2009. Phillips denied making these statements to Ruley.

On April 13, 2009, near the end of Phillips' trip, he and Ruley began working on watch together. Phillips was serving as first mate aboard the vessel and was deckhand Ruley's direct supervisor. As the first mate, Phillips directed the work that was being performed.

Ruley testified that after he and Phillips relieved the other watch, their first task was to put away a stationary wire on a loaded barge that had been secured to a deck fitting on an adjacent empty barge. Ruley testified that after first advising Phillips, he dropped the bite of that wire from the empty barge to the loaded barge near where Phillips was standing. Ruley testified clearly that the wire missed Phillips by about two feet and did not strike or contact him in any way. Nevertheless, Phillips grabbed his shoulder and claimed that the wire hit him. Phillips then continued to work the rest of the watch and did not mention anything else about the incident.

Phillips' testimony about his alleged injury is quite different. According to Phillips, he had selected a portable 35' wire to lay between the empty and loaded barges. He had given one end to Ruley and told him to hold it. Phillips then attempted to walk a kink out of the wire, a normal and routine task. Phillips claims that Ruley, unbeknownst to Phillips, tried to help Phillips by attempting to get the kink out of the wire himself and that Ruley's attempt caused the wire to spin out of Phillips' hand and strike him in the forearm and upper arm. After his alleged injury, Phillips concedes, he continued to work and used the wire as he originally intended.

The next day, Phillips completed a company injury report stating that he was injured when he "was putting eye of wire from mt [empty] to load and eye twisted out of my hand and hit fore arm and wire hit upper arm area." (Ex. HM 19). Phillips' injury report lists Ruley as a witness but mentions nothing about Ruley doing anything improper. After Phillips completed the report, he obtained signatures from all other crewmembers on Hunter Marine's "Witness/Non-Witness Report. (Ex. HM 20). Ruley was the only crewmember who acknowledged being a witness to an incident involving Phillips. Ruley testified he believed that, if Phillips tried to blame his injury on Hunter Marine, company officials would ask Ruley what he saw. Ruley also testified that his signature to being a witness definitely was not intended to verify Phillips' story.

Later on April 14, Phillips debarked and was brought to Hunter Marine's office, where he hand-delivered his injury to Hunter Marine's Director of Safety and Risk Management, Donnie Hall. Hall arranged for Phillips to be seen that day at a Concentra clinic in Nashville, Tennessee. Concentra placed Phillips on light duty, and he returned to the boat for two days. He performed little or no work in order to complete his scheduled trip. He departed the *L.R. Chapman* on April 16, his regular departure date. Upon departure, Phillips completed and signed a departure form stating that he was departing because it was his "scheduled relief." (Ex. HM 18). Phillips left blank the question whether he sustained any illness or injury while aboard the vessel. (*Id.*).

5

Ruley testified that a couple of days after Phillips left the *L.R. Chapman*, Phillips called Ruley and told him he "would make it worth his while" if Ruley would agree to falsely substantiate Phillips' injury claim. Ruley refused to participate in a fraud against Hunter Marine. Phillips denied making this statement, though he did not deny calling Ruley at or around that time.

Two days after he left the *L.R. Chapman*, on April 16, 2009, Phillips and his wife went on a gambling trip to Tunica, Mississippi, about 380 miles from his home. After returning to his Illinois home, Phillips sought medical care for his shoulder, and later for his neck. Hunter Marine arranged for the services of Simmons Medical Case Management to find Phillips medical care in the St. Louis area.

After a period of conservative medical treatment that included physical therapy and a cervical epidural steroid injection that failed to remedy Phillips' complaints, he saw St. Louis neurosurgeon Dr. Robert Bernardi on July 28, 2009. Bernardi reviewed an MRI scan of Phillips' spine taken on May 27, 2009 and concluded Phillips had a C5-6 disc herniation that required surgery.[3] The May 27 MRI did not reveal a disc herniation at any other level of Phillips' cervical spine. (Court's Ex. 1, Bernardi Depo., at 38). Hunter Marine authorized the spinal surgery, which Bernardi performed on August 31, 2009. Bernardi testified that the surgery was a success and Phillips reported after the surgery that his pain was gone. (*Id.* at 30, 47). Dr. Bernardi viewed Phillips' prognosis as "excellent." (*Id.* at 30). Dr. Bernardi anticipated that Phillips would return to his normal activities without any permanent restrictions by the end of 2009.

For more than seven months, Hunter Marine paid for all of Phillips' medical care for his shoulder and neck, an obligation known as "cure" under applicable maritime law. Hunter

---

[3] Phillips rightly point out that Dr. Bernardi testified that the "C5-6 . . . disc protrusion . . . was almost certainly not present prior to 04-13-2009." But that conclusion was based on Phillips' medical and work history *as Dr. Bernardi knew it*. In other words, Phillips told Bernardi he was hurt on April 13. But Phillips was lying. That is consistent with the jury's findings that Phillips materially misrepresented his injuries to Hunter Marine, and the Court's findings (see below) that Mr. Phillips was simply not injured aboard the *L.R. Chapman*.

Marine also paid daily maintenance and supplemental wages to Phillips. The parties have stipulated that Hunter Marine paid the following amounts of money stemming from Phillips' alleged injury:

a. Medical care and treatment for Phillips totaling $67,670.93;

b. Maintenance payments to Phillips at a rate of $25.00 per day from April 17–November 19, 2009, totaling $4,900.

c. Wage supplements to Phillips from April 17–November 19, 2009, totaling $19/173.45; and

d. Mileage reimbursements to Phillips totaling $366.50.

(Doc. 71). The grant total of those payments is $92,110.88.

Phillips never returned to work after April 16, 2009, and Anthony Ruley had no information about Phillips' medical treatment or Hunter Marine's six-plus months of payments. Ruley continued to assume that the company would talk to him about Phillips' injury, if it became necessary.

In October 2009, another Hunter Marine employee asked Donnie Hall about Phillips' status and suggested Hall talk to Ruley "because the alleged injury was not what it seemed." In early November 2009, Hall interviewed Ruley and Ronnie Willett, as well as two other crew members who worked with Phillips in March and April 2009; Hall took recorded statements about their knowledge. Ruley testified at trial, and Willett's deposition was read to the jury.

At trial, Hall was not asked on direct examination what Ruley and the other crew members had said in their statements. However, Phillips' attorney asked Hall what Ruley had told him, thus waiving any hearsay objection. Hall then testified that Ruley had told him: (1) Phillips told Ruley, *prior to his alleged injury on April 13, 2009*, that he had hurt his arm and shoulder while working on his car at home and that he was going to get the company to pay for it before the trip was over; (2) Phillips had falsely claimed to have been struck by a wire on April 13, 2009, when he had not been; and (3) after Phillips left the *L.R. Chapman*, he phoned Ruley to attempt to bribe him to go along with Phillips' false injury report. After speaking with Ruley, Willett, and the other crew

7

members, Hall terminated Phillips' employment and further maintenance and cure benefits on November 20, 2009. Phillips filed this lawsuit five days later on November 25, 2009.

Less than four weeks after filing this lawsuit, Phillips saw orthopedic surgeon Dr. George Schoedinger on December 21, 2009. Dr. Schoedinger's physical examination revealed only subjective complaints of pain. (Court's Ex.4 at 30–31). Schoedinger scheduled another MRI on Phillips' cervical spine, which was performed on December 30, 2009. (Ex. HM 32). Upon reviewing the MRI, Schoedinger concluded that Phillips' symptoms were caused by a disc protrusion at C6-7, one level below the fusion surgery that Dr. Bernardi had done at C5-6 four months earlier. Dr. Schoedinger told Phillips that if he wished to elect surgical treatment, he recommended an anterior discectomy and fusion at C6-7.

Dr. Bernardi testified unequivocally, based on the May 2009 MRI, that any problem with the C6-7 disc must have occurred after May 2009 and, therefore, would be unrelated to Phillips alleged April 2009 injury. Schoedinger reviewed Phillips' May 27 MRI and issued a supplemental report stating that the only abnormality he observed was the disc rupture at C5-6, stating nothing about any abnormality at C6-7. (Ex. HM 38).[4] Phillips has not presented any competent medical evidence to rebut Dr. Bernardi's testimony that any problems at the C6-7 level are unrelated to his alleged April 2009 injury. Accordingly, all of the medical testimony in the case confirms that Phillips C6-7 disc protrusion (which was present by December 2009) was not present in May 2009, more than a month after his alleged injury.

As set forth above, the threshold issue in the case is whether Phillips' injury occurred on the *L.R. Chapman*, as he testified, or whether it occurred before he boarded the vessel and his

---

[4] Phillips argues that Schoedinger's earlier testimony, based on the December 2009 examination, linked the purported accident with the C6-7 rupture. (*See* Doc. 96, p. 13). That position ignores Schoedinger's supplemental medical report, in which he notes reviewing a May 2009 X-ray of Phillips' spine and *only* mentions an extrusion at C5-6. Like Dr. Bernardi, Dr. Schoedinger was initially guided by Phillips' false history: that his back problems stemmed from a mid-April accident.

claimed injury aboard the vessel was false, as Hunter Marine contends. The testimony of Phillips on one hand, and of Willett and Ruley on the other hand, cannot be reconciled. Therefore, the Court — like the jury previously — must make credibility determinations regarding which testimony to believe.

Hunter Marine presented extensive evidence relating to Phillips' character for untruthfulness, including numerous prior convictions for crimes involving deceit and dishonesty. In 1994, Phillips pled guilty in Jersey County, Illinois, to obstructing justice (Case No. 94-cv-87) for knowingly providing false information to a police officer about his identity. (Ex. HM 4). That same year, Phillips also pled guilty to "deceptive practice" (Case No. 94-cv-78) for paying for property with three separate checks that he knew would be rejected by the bank. (Ex. HM 5). In 2003, Phillips pled guilty in Madison County, Illinois, to forgery (Case 03-CF-385) in connection with six forged checks he signed for the account of "Edwardsville Senior Nutrition Site." (Ex. HM 6). That same year, he also pled guilty to another forgery charge (Case 03-CF-539). (Ex. HM 7). Regarding that conviction, Phillips' counsel said in opening statement that his client had taken an entire book of checks that were not his and signed them as if they were.[5]

Phillips also lied about his prior felonies and misdemeanors when he applied for a job at Hunter Marine. (Ex. HM 1 and HM 2). As part of his 2008 application, Phillips stated that his only felony conviction was for "child support," completely omitting his felonies for obstructing justice, deceptive practices, and forgery. Phillips' attempted excuse for these written lies — that he reported verbally the remainder of his felonies to former Hunter Marine employee Julia Lewis, who then told Phillips to ignore them — was not credible. Hall testified that Lewis worked closely with him on such issues and would not have done what Phillips claimed. It is also persuasive that in a

---

[5] In his proposed findings of fact, Phillips argues that the Court's admission of "stale convictions" warrants a new trial. The Court weighed the probative value and prejudicial effect of Phillips' older convictions. While Phillips has made his record regarding his objection to the admission of his older convictions, the Court is disinclined to address the issue here rather than in a separate motion.

prior 2004 application with Hunter Marine — before Julie Lewis even worked there — Phillips answered the question about prior felonies in exactly the same manner that he did in 2008 — disclosing only that he was convicted of "child support." (Ex. HM 3). In sum, the Court concludes that Phillips' testimony about telling Hunter Marine's Julie Lewis about his true criminal past is not credible. The Court also notes that Phillips was untruthful in his application when he stated he had no misdemeanor convictions, although he had been convicted of theft only one year earlier.

In short, Phillips asks this Court to reject the testimony of witnesses Ruley and Willett in favor of his own testimony, even though substantial evidence has been presented that Phillips has a long history of lying to employers, police officers, banks and others throughout his life to suit his financial interests. Moreover, Phillips failed to present any evidence why Willett (who is no longer employed at Hunter Marine) and Ruley would lie in such a dramatic fashion in this proceeding.

Phillips raises two key arguments in support of his testimony that he was injured (and that the testimony of Ruley and Willett is therefore not credible): (1) that he worked aboard the *L.R. Chapman* from March 14 until April 14, 2009, which he could not have done had his injury occurred at home; and (2) that the vessel's log contradicts Ruley's testimony about the events of April 13. With respect to Phillips' first argument, as first mate he could order the deckhands under him to do necessary strenuous tasks during his watch. And as someone planning to make a fraudulent injury claim, he would not want the "injury" to occur just after boarding the vessel. That would have raised suspicions. Moreover, he spent time talking to other crewmembers, like Willett and Ruley, in an attempt to find someone who would assist him in a fraudulent scheme. It is evident that Phillips' neck condition did not render him bedridden or unable to engage in life's activities. To the contrary, even after he departed the *L.R. Chapman* he was well enough to travel several hundred miles by car for a long weekend gambling in Tunica, Mississippi.

Regarding Phillips' second argument, that the *L.R. Chapman's* log disproves Ruley's testimony, the Court disagrees. The log states that the *L.R. Chapman* "shift[ed] load in tow from 10–11 a.m. on April 13, 2009, wait[ed] for traffic until 11:30 a.m., and transited from mile 124 until it reached mile 148 at 6:30 p.m. that night. (Ex. HM 21). Ruley and Phillips agreed that their shift technically started at 11:30 a.m., but that they relieved their co-workers early, as they normally did. Ruley testified that he started working between 10 and 11 a.m. Phillips contends they started working at 11 a.m. All the time entries in the log notably end in zeroes or fives, suggesting the entries are rough estimates rather than precise recordings. Regardless of whether Ruley's testimony is 100% accurate about shift times, the Court found his testimony credible,[6] and concludes Ruley testified truthfully about Phillips approaching him to assist Phillips in getting Hunter Marine to pay for previously sustained injuries. The Court further credits Willett's testimony regarding Phillips' attempts to enlist him in verifying Phillips' concocted story. And the Court finds Phillips was not truthful, and does not credit his testimony regarding the timing or source of his injuries.

## CONCLUSIONS OF LAW

Phillips' allegations against Hunter Marine sound under the Jones Act and under judge-made general admiralty law. The Jones Act states that "a seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery to . . . a railway employee apply to an action under this section." **Deering v. Nat'l Maint. & Repair, Inc., 627 F.3d 1039, 1041 (7th Cir. 2010) (quoting 46 U.S.C. § 30104).** "General admiralty law entitles an injured seaman to

---

[6] Phillips also attacks Ruley's credibility by pointing to the fact that Ruley checked the "Witnessed Incident" box on the accident report and that Phillips' car was repaired while Phillips was aboard the *L.R. Chapman*. Both are consistent with Ruley's story. As discussed above, Ruley testified that he checked the box because he thought Phillips may make a fraudulent claim regarding an accident that never happened. And while evidence about Phillips' car was ambiguous at times, it does support Hunter Marine's theory that Phillips was, at the very least, working on his car before he boarded the *L.R. Chapman*. The fact that Phillips' car was repaired while he was aboard the vessel is consistent with the fact that he had a broken car—one which he could have been working on—sometime before his trip. Phillips has the burden of showing he was injured, or aggravated an injury, aboard the vessel. The Court need not find he did injure himself working on a car to conclude, as it does, that he did not injure himself aboard the *L.R. Chapman*.

maintenance (shelter until he recovers) and cure (treatment), plus lost wages—all irrespective of any negligence on his part—and, if his injury was caused by the unseaworthiness of the ship on which he was injured, to damages comparable to those available in a nonmaritime personal injury suit." **Id.** Under maritime law, an employer is absolved from paying maintenance and cure when an employee misrepresents his medical status when seeking employment. **Johnson v. Cenac Towing, Inc., 544 F.3d 296, 301 (5th Cir. 2008) (citing McCorpen v. Central Gulf Steamship Corp., 396 F.2d 547, 549 (5th Cir. 1968))**. Succeeding on a *McCorpen* defense requires a defendant to show (1) the employee intentionally misrepresented or concealed medical facts; (2) those facts were material to the employer's decision whether or not to hire the employee; and (30 there exists a nexus between the information withheld and the injury incurred. **Id.**

Hunter Marine submits that the jury's answers to special interrogatories on its counterclaims preclude the Court, as a matter of law, from finding in favor of Phillips on his claims. There can be little dispute that Hunter Marine's counterclaims and Phillips' claims share crucial overlapping factual issues, which include, most importantly, whether Phillips injured himself at home or on the job at Hunter Marine. By finding against Phillips, the jury clearly believed that Phillips concealed and/or misrepresented information with the intent to deceive Hunter Marine regarding the timing and source of his injury. Hunter Marine contends that any judgment by the Court for Phillips on his claims would necessarily include a finding that he was injured on the *L.R. Chapman* and that such a finding would be utterly inconsistent with the jury's verdict. Phillips disagrees, and posits that the jury's verdict hypothetically leaves room for him to be entitled to some relief. The Court need not reach the legal issue because its factual findings erase any hypotheticals from the equation. The Court, as explained above, credits Ruley's and Willett's testimony, and finds Phillips not credible. In light of that credibility finding and the evidence presented, the Court concludes that Phillips was injured sometime before he boarded the *L.R. Chapman* and that he did

not suffer an injury — or the aggravation of a previously-existing injury — while working on that vessel. Phillips' claims fail.

## CONCLUSION

For the foregoing reasons, the Court finds for Hunter Marine and against Forrest W. Phillips on all Phillips' claims. Based on the Court's findings and the Jury's verdict, the Court **DIRECTS** the Clerk to enter final judgment in favor of Hunter Marine Transport, Inc., and Hunter Marine Administrative Services, LLC, and against Forrest W. Phillips in the total amount of $97,110.88.

**IT IS SO ORDERED.**

**DATE: 9/26/2012**                                        /s/ *Stephen C. Williams*
                                                           **STEPHEN C. WILLIAMS**
                                                           United States Magistrate Judge